Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: DUSTIN ANDERSEN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTIN ANDERSEN on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>TRIPADVISOR LLC,<br><br>Defendants. | Case No:<br><br>**COMPLAINT**<br>1. Cal. Penal Code § 638.51<br>2. Cal. Civil Code § 1798.100, *et seq.*<br>3. Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br><br>**CLASS ACTION** |

# I.    NATURE OF THE ACTION

1. Defendant TRIPADVISOR LLC ("Defendant" or "TRIPADVISOR") owns and operates a website, www.tripadvisor.com (the "Website").

2. This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3. Plaintiff DUSTIN ANDERSEN files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google DoubleClick Tracker
- Rubicon Tracker
- Amazon AdSystem Tracker
- Casale Media Tracker (IndexExchange)

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

CLASS ACTION COMPLAINT

8.      The Trackers are operated by distinct third parties: Google LLC (Google DoubleClick Tracker); Magnite, Inc. (Rubicon Tracker); Amazon.com, Inc. (Amazon AdSystem Tracker); and Index Exchange Inc. (Casale Media Tracker). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9.      Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

10.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11.     Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.  By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12.     By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

13.     Defendant provides a "Privacy and Cookies Statement" on the Website (the "Privacy Policy") but does not conform to the Privacy Policy:

CLASS ACTION COMPLAINT

a.   Defendant does not clearly disclose that real-time behavioral data is transmitted to third parties immediately upon site arrival;

b.   Defendant represents that sensitive personal information is not used for inferring characteristics; however, search terms, page activity, and inferred interests are transmitted to platforms that use such data for profile building;

c.   Tracking and third-party sharing occurs prior to presenting users with a valid choice to opt-out or manage consent;

d.   Defendant claims data collection is limited to what is necessary to provide services or with consent; however, extensive behavioral data is collected on purely informational pages; and

e.   Defendant omits material details regarding the depth of personal data shared with third parties and the nature of behavioral profiling activities.

14.   Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

15.   Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.   **PARTIES**

16.   Plaintiff DUSTIN ANDERSEN ("Plaintiff") is a California citizen residing in Riverside County and has an intent to remain there.  Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter including but not limited to April 28, 2025, and during which time Plaintiff submitted private information on the Website in order to complete a purchase from TRIPADVISOR in the amount of $40.00 with a credit card. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

CLASS ACTION COMPLAINT

17.     Defendant TRIPADVISOR LLC is a Delaware limited liability company that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

18.     TRIPADVISOR is a leading online travel and tour booking platform owned by parent company Tripadvisor, Inc. The company operates globally but maintains a strong online presence throughout the United States. Headquartered at 400 1st Avenue, Needham, Massachusetts, TRIPADVISOR allows users to search, compare, and book thousands of travel experiences and excursions in destinations worldwide.

19.     While Tripadvisor, Inc. operates a variety of brands, TRIPADVISOR is directly responsible for processing tour bookings, collecting customer data, and facilitating user interaction with local service providers. Through its platform, TRIPADVISOR gathers user information for purposes including transaction processing, behavioral profiling, and advertising — all of which implicate privacy compliance obligations under California and federal law.

20.     The Website serves as TRIPADVISOR's primary digital platform. It enables users to browse travel experiences, compare prices, manage bookings, and engage with customer support. In addition to these operational roles, the site functions as a powerful vehicle for behavioral surveillance and targeted advertising. Through the deployment of third-party tracking technologies — including tracking pixels, event beacons, and behavioral monitoring scripts — the Website collects detailed user interaction data. These tracking practices are central to TRIPADVISOR's data monetization strategy and present serious implications under the California Invasion of Privacy Act (CIPA) and related privacy statutes.

### III.    <u>JURISDICTION AND VENUE</u>

21.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.

CLASS ACTION COMPLAINT

1   Further, at least one member of the proposed class is a citizen of a State within the
2   United States and at least one defendant is the citizen or subject of a foreign state.

3   22.   This Court has personal jurisdiction over Defendant because, on
4   information and belief, Defendant has purposefully directed its activities to the Central
5   District of California by regularly engaging with individuals in California through its
6   website.  Defendant's illegal conduct is directed at and harms California residents,
7   including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would
8   not have suffered harm.

9   23.   Venue is proper in the Central District of California pursuant to 28 U.S.C.
10  § 1391 because Defendant (1) is authorized to conduct business in this District and has
11  intentionally availed itself of the laws and markets within this District; (2) does
12  substantial business within this District; (3) is subject to personal jurisdiction in this
13  District because it has availed itself of the laws and markets within this District; and (4)
14  the injury to Plaintiff occurred within this District.

15  ## IV.   **GENERAL ALLEGATIONS**

16  ### 1.   *The California Invasion of Privacy Act (CIPA)*

17  24.   Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a
18  legislative measure designed to safeguard the privacy rights of California residents by
19  prohibiting unauthorized wiretapping and eavesdropping on private communications.
20  The California Legislature recognized the significant threat posed by emerging
21  surveillance technologies, stating that "the development of new devices and techniques
22  for the purpose of eavesdropping upon private communications … has created a serious
23  threat to the free exercise of personal liberties and cannot be tolerated in a free and
24  civilized society" (Cal. Penal Code § 630).

25  25.   CIPA specifically prohibits the installation or use of "pen registers" and
26  "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

27  26.   A "pen register" is defined as a device or process that records or decodes
28  dialing, routing, addressing, or signaling information transmitted by an instrument or

facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

27.    Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

28.    In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

29.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

30.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

31.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

32.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

33.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long

CLASS ACTION COMPLAINT

1  been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir.

2  2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

3      34.    Both the legislative history and statutory language indicate that the

4  California Legislature intended CIPA to protect core privacy rights. Courts have found

5  that violations of CIPA give rise to concrete injuries sufficient to confer standing under

6  Article III. (See *Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook*

7  *Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

8      35.    Individuals may pursue legal action against violators of any CIPA

9  provision, including Section 638.51, and are entitled to seek $5,000 in statutory

10 penalties per violation (Cal. Penal Code § 637.2(a)(1)).

11      **2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

12      36.    When the Plaintiff and Class Members accessed the Website, their

13 browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts

14 the content and functionality of the site. In response, the server transmitted an HTTP

15 response containing the necessary resources—including HTML, cascading style sheets

16 (CSS), JavaScript files, and image assets—used by the browser to render and display

17 the webpage. These resources also included client-side scripts that initiate

18 communication with third-party services for analytics, marketing, and tracking

19 purposes. ***Figure 1*** below illustrates sample HTTP requests.

### Figure 1



27      37.    The server's response included third-party tracking scripts that were

28 executed by the Plaintiff's and Class Members' web browsers. These scripts, once

CLASS ACTION COMPLAINT

executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data — typically via HTTPS requests — to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data—referred to as User Information—included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

38.    The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39.    An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code.

40.    Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

41.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and

can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

42.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

43.    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

44.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

45.    Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

### 3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting*

46.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts

CLASS ACTION COMPLAINT

embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

47.    This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

48.    When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

49.    The ability to associate a persistent digital profile with a specific individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

50.    In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of

electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

51.     The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

52.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header.  In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.     *Plaintiff's And Class Members' Data Has Financial Value***

53.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

54.     Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

CLASS ACTION COMPLAINT

55.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

56.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

57.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars.  Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

/ /

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.
[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

CLASS ACTION COMPLAINT

58.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

59.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

60.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with.  This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

---

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT

62.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

63.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction.  IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

64.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ /

15

**6.    *The Trackers Function Together to Achieve Targeted Objectives***

65.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

66.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

67.    On the Website, a coordinated network of third-party trackers is used to conduct identity resolution, behavioral targeting, and data monetization. These technologies are deployed through a combination of embedded scripts and dynamically injected code that activate during or immediately following the initial page load. The Website executes JavaScript and initiates beacon requests to third-party domains controlled by trackers such as Google DoubleClick, Rubicon (operated by Magnite, Inc.), Amazon AdSystem, and the Casale Media Tracker, operated by Index Exchange Inc. (formerly known as Casale Media). These trackers silently collect user interaction data during the initial session load and transmit that data to external servers in real time. Together, they form a unified surveillance infrastructure that enables Defendant to monitor and respond to user behavior with commercial precision.

68.    Identity resolution on the Website is facilitated through trackers operated by Rubicon, Amazon AdSystem, and the Casale Media Tracker, operated by Index Exchange Inc. (formerly known as Casale Media). Rubicon transmits identity signals to

CLASS ACTION COMPLAINT

endpoints such as prebid-a.rubiconproject.com and token.rubiconproject.com, participating in real-time bidding protocols that match user activity on the Website with profiles built across the open web. Amazon AdSystem sends identity-related signals to domains including c.amazon-adsystem.com and aax.amazon-adsystem.com, which are known to support demand-side targeting and probabilistic user matching. The Casale Media Tracker contributes to the identity pipeline through cookie syncing and identifier mapping endpoints hosted on both casalemedia.com (ssum-sec.casalemedia.com and dsum-sec.casalemedia.com) and indexww.com (cdn.indexww.com and js-sec.indexww.com), which allow Index Exchange to assign advertising identifiers and correlate user sessions across web properties. These technologies enable Defendant and its partners to de-anonymize users, correlate session data, and build persistent identity graphs.

69.    The Website channels user identity signals and behavioral data into commercial data monetization pipelines, with particular emphasis on programmatic advertising infrastructure. Google DoubleClick delivers dynamically rendered advertisements through domains such as securepubads.g.doubleclick.net and cm.g.doubleclick.net, which are designed to tailor ad content based on behavioral attributes and inferred audience segments. Rubicon communicates auction data and user identifiers to endpoints including micro.rubiconproject.com and prebid-a.rubiconproject.com, facilitating real-time bidding and behavioral audience targeting. Amazon AdSystem enhances these pipelines through requests to domains like c.amazon-adsystem.com and s.amazon-adsystem.com, which support the delivery of interest-based advertising and retargeting campaigns. The Casale Media Tracker, operated by Index Exchange Inc. (formerly known as Casale Media), further contributes to these pipelines through domains under both indexww.com and casalemedia.com. These include cdn.indexww.com and js-sec.indexww.com for behavioral tracking scripts and pixel delivery, as well as ssum-sec.casalemedia.com and dsum-sec.casalemedia.com for identifier syncing. This interconnected infrastructure enables

17

TRIPADVISOR to monetize user activity both directly and indirectly by placing users into advertiser-defined audience segments and selling access to their behavioral data in real time.

70.    Defendant shares User Information with third party advertising platforms, including DoubleClick, Rubicon, Amazon AdSystem, and Casale Media. These companies operate real time bidding systems that sell ad space to the highest bidder using data collected from users during their visit.  When a user loads the Website, data is immediately sent to these platforms without any action or consent from the user. This includes internet protocol address, device and browser details, and page context.

71.    The presence of Prebid.js on the Website confirms that Defendant uses header bidding, a method that offers each ad space to multiple bidders at once.  Header bidding is designed to increase revenue by allowing advertisers to compete in real time for ad placement. Defendant collects user data and sends it to several advertising exchanges, then delivers the winning ad and receives payment based on how often the ad is viewed or clicked.  These data exchanges serve no purpose for the user and exist only to support Defendant's advertising business. By turning user activity into advertising revenue, Defendant treats personal data as a commodity.

## V.    **SPECIFIC ALLEGATIONS**

### 1.    *The Google DoubleClick Tracker*

72.    The Google DoubleClick Tracker is a digital advertising and behavioral tracking technology operated by Google LLC. It is designed to deliver display advertisements, measure engagement, and support real-time bidding on programmatic ad exchanges. The DoubleClick Tracker enables Google and its advertising clients to collect detailed user interaction data and optimize ad delivery across a vast network of third-party websites.

73.    When implemented on the Website, the Google DoubleClick Tracker collects a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and in-page interaction data such as clicks or hover events. It also

captures technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers—often placed via cookies or pixel fires—that allow Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles.

74.     The Google DoubleClick Tracker is capable of monitoring key performance events on the Website, including booking activity, engagement with partner listings, or progression through checkout flows. These interaction signals are transmitted to Google's ad infrastructure to facilitate targeted advertising, audience retargeting, and conversion tracking. The DoubleClick Tracker executes via JavaScript calls to domains including securepubads.g.doubleclick.net, cm.g.doubleclick.net, and googleads.g.doubleclick.net, and it activates automatically upon page load without requiring any action by the user.

75.     *Figure 2* below is a screenshot from the Website, confirming that the Google DoubleClick Tracker script was triggered automatically upon visiting the homepage. A GET request to googleads.g.doubleclick.net includes cookie-based session identifiers and audience segmentation values. The request returned a 200 OK status, confirming successful communication with Google's advertising infrastructure. This activity occurred prior to any user interaction, verifying that the Google DoubleClick Tracker was active during the user's initial session on TRIPADVISOR's website.

/ /

/ /

/ /

/ /

/ /

/ /

CLASS ACTION COMPLAINT

**Figure 2**



76.    **Figure 3** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for pagead2.googlesyndication.com, a domain operated by Google. This DNS transaction confirms that TRIPADVISOR's Website initiated a connection to Google's ad infrastructure during the initial session load. The DNS request and response occurred before any user interaction and reflect background communication consistent with third-party tracking operations, confirming that the Google DoubleClick Tracker was silently activated in the background.

/ /

/ /

/ /

/ /

/ /

/ /

20

***Figure 3***



77.    Defendant surreptitiously installed, executed, embedded, or injected the Google DoubleClick Tracker onto users' browsers by referencing Google's JavaScript tracking scripts within the Website. When a user visits the Website, their browser automatically executes this code, which initiates outbound network requests to Google's advertising servers and transmits metadata—including IP address, page URL, referrer information, and device details—as part of a third-party ad targeting and profiling system.

78.    The Google DoubleClick Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

79.    The Google DoubleClick Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

80.    The Google DoubleClick Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures outgoing signaling data—such as URLs visited, click paths, timestamps, and referrer

CLASS ACTION COMPLAINT

headers—and also processes incoming metadata such as ad impressions and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader advertising profiles.

81.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google DoubleClick Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

82.    Consequently, the Google DoubleClick Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**2.    *The Rubicon Tracker***

83.    The Rubicon Tracker is a programmatic advertising technology operated by Magnite, Inc., the parent company of the legacy Rubicon Project. It is designed to enable real-time bidding, identity matching, and behavioral profiling through its integration into publisher websites. The Rubicon Tracker operates across a wide array of domains including rubiconproject.com, prebid-a.rubiconproject.com, and fastlane.rubiconproject.com, and supports header bidding auctions and audience segmentation across the open web.

84.    When deployed on the Website, the Rubicon Tracker collects and transmits metadata such as page URLs, referrer headers, IP addresses, timestamps, and device-level information including screen resolution, operating system, and browser identifiers. It also supports cookie synchronization and real-time ad auctions, allowing advertisers to bid on user impressions based on behavioral and contextual signals. These functions enable persistent tracking of user activity across websites, devices, and sessions.

85.    The Rubicon Tracker is capable of logging user interactions and interest signals from TRIPADVISOR's Website, such as page navigation, engagement with

CLASS ACTION COMPLAINT

travel-related listings, and session duration. These data points are shared with Rubicon's ad exchange infrastructure and used to facilitate targeted advertising, optimize bid responses, and enhance user-level profiling for downstream ad targeting. The tracker operates automatically during the initial page load without any affirmative action by the user.

86.    **Figure 4** below is a screenshot from the Website, confirming that the Rubicon Tracker was triggered automatically upon visiting the homepage. A GET request to ads.rubiconproject.com, a domain operated by Magnite, Inc., was recorded upon page load. The request returned a 200 OK status and loaded a configuration file that initiates Rubicon's real-time advertising routines. This communication transmits metadata such as session timing, page context, and device attributes, directly supporting Rubicon's behavioral tracking, audience segmentation, and programmatic ad targeting infrastructure. The request confirms that the Rubicon Tracker was silently activated during the initial session load on TRIPADVISOR's website.

*Figure 4*



/ /

CLASS ACTION COMPLAINT

87. ***Figure 5*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for ads.rubiconproject.com, a domain operated by Magnite, Inc. This DNS transaction confirms that TRIPADVISOR's Website established a connection to Rubicon's ad infrastructure during the initial session load. The DNS request and response occurred before any user interaction and demonstrate that the Rubicon Tracker was silently activated in the background as part of third-party tracking operations.

***Figure 5***



88. Defendant surreptitiously installed, executed, embedded or injected the Rubicon Tracker onto users' browsers by embedding or injecting Rubicon's tracking endpoints into the Website's source code or tag orchestration framework. When a user visits the Website, their browser executes the corresponding JavaScript code, initiating tracking requests that transmit metadata—including IP address, referrer data, and interaction signals—to Rubicon's servers as part of third-party advertising operations.

89. The Rubicon Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

90.     The Rubicon Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device.  See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

91.     The Rubicon Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers — all of which qualify as routing or signaling information under CIPA.

92.     The Rubicon Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures addressing and signaling metadata—including page URLs, device identifiers, timestamps, and referrer data—associated with electronic communications between the user and the Website. These signals are silently diverted to Rubicon's servers, enabling user tracking and advertising profile construction in real time.

93.     Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Rubicon Tracker on Plaintiff's and Class Members' browser or to collect or share data with Rubicon's servers.

94.     Consequently, the Rubicon Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**3.      Amazon AdSystem Tracker**

95.     The Amazon AdSystem Tracker is an advertising and behavioral targeting technology operated by Amazon.com, Inc. It is designed to support interest-based advertising, audience segmentation, and real-time ad delivery through integration with Amazon's demand-side platform (DSP). When embedded on publisher websites, the Amazon AdSystem Tracker enables Amazon to collect behavioral data, resolve user identities, and target advertisements based on browsing history and contextual relevance.

96.     When deployed on the Website, the Amazon AdSystem Tracker transmits a range of user metadata, including page URLs, timestamps, referrer headers, IP address, and device-specific details such as browser type, screen resolution, and operating system. These data points are associated with unique browser or device identifiers—often set via cookies or redirect-based identifiers—which allow Amazon to track user behavior across unrelated websites and sessions.

97.     The Amazon AdSystem Tracker supports behavioral retargeting and interest-based advertising through real-time communication with domains such as c.amazon-adsystem.com, aax.amazon-adsystem.com, and s.amazon-adsystem.com. These endpoints are invoked via JavaScript execution or embedded tracking pixels that activate automatically when the user visits the Website. The tracker operates silently and does not require the user to click, scroll, or interact in any way before initiating outbound network requests.

98.     *Figure 6* below is a screenshot from the Website, confirming that the Amazon AdSystem Tracker was triggered automatically upon visiting the homepage. A GET request to c.amazon-adsystem.com, a domain operated by Amazon, was recorded and returned a 200 OK status. The request loaded a JavaScript file that initiates behavioral tracking and real-time advertising functionality. This activity occurred prior to any user interaction, verifying that the Amazon AdSystem Tracker was active during the user's initial session on TRIPADVISOR's website.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

CLASS ACTION COMPLAINT

***Figure 6***



99.     ***Figure 7*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for s.amazon-adsystem.com, a domain operated by Amazon. This DNS transaction confirms that TRIPADVISOR's Website established a connection to Amazon's tracking infrastructure during the initial session load. The DNS request and response occurred before any user interaction and demonstrate that the Amazon AdSystem Tracker was silently activated in the background as part of third-party tracking operations.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

27

***Figure 7***



100.   Defendant surreptitiously installed, executed, embedded, or injected the Amazon AdSystem Tracker onto users' browsers by referencing Amazon's tracking endpoints within the Website. When a user visits the Website, their browser automatically executes these scripts or pixels, initiating requests that transmit metadata—including IP address, referrer information, and device-level attributes—to Amazon's servers for advertising and audience targeting purposes.

101.   The Amazon AdSystem Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

102.   The Amazon AdSystem Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

103.   The Amazon AdSystem Tracker initiates a connection to its advertising infrastructure upon page load and transmits routing information—including the user's IP address, page path, timestamp, and identifiers—without any affirmative user input.

CLASS ACTION COMPLAINT

These characteristics qualify the tracker as a pen register and/or trap and trace device under the California Invasion of Privacy Act.

104. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Amazon AdSystem Tracker on Plaintiff's and Class Members' browser or to collect or share data with Amazon's servers.

105. Consequently, the Amazon AdSystem Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**4.     *Casale Media Tracker (Index Exchange)***

106. The Casale Media Tracker is a behavioral tracking script operated by Index Exchange Inc., formerly known as Casale Media, which operates under both the casalemedia.com and indexww.com domains. Deployed through embedded code on the Website, the Casale Media Tracker monitors user activity and transmits behavioral signals to Index Exchange's advertising infrastructure. Network requests are initiated on the Website to both the casalemedia.com and indexww.com domains, including during the homepage session. Endpoints under the casalemedia.com domain—such as ssum-sec.casalemedia.com    and    dsum-sec.casalemedia.com—support    identity-matching workflows and cookie syncing protocols used for cross-site tracking. Endpoints under the indexww.com domain—including cdn.indexww.com and js-sec.indexww.com—deliver JavaScript resources and tracking pixels that collect metadata related to user activity. These domains function in coordination to facilitate persistent tracking, real-time bidding, behavioral targeting, audience profiling, and broader data monetization.

107. By transmitting this behavioral data, the Casale Media Tracker enables TRIPADVISOR and Index Exchange to conduct identity resolution by linking site interactions to known or inferred advertising identifiers. The tracker facilitates targeted

CLASS ACTION COMPLAINT

advertising by enabling TRIPADVISOR to make user interaction data available to Index Exchange's demand-side partners, who can then bid on ad placements tied to specific behavioral signals. In addition, Index Exchange aggregates this data to improve campaign attribution, bidding precision, and predictive audience modeling. These capabilities enhance advertising outcomes and support TRIPADVISOR's broader data monetization strategy by increasing ad revenue and deepening behavioral insight into Website users. Network requests are initiated on the Website to both the casalemedia.com and indexww.com domains, including during the homepage session. The casalemedia.com domain transmits identity signals and facilitates cookie synchronization via endpoints such as *ssum-sec.casalemedia.com* and *dsum-sec.casalemedia.com*, while the indexww.com domain delivers tracking scripts and pixels through endpoints like *cdn.indexww.com* and *js-sec.indexww.com*. Together, these domains function as parts of a unified tracking system operated by Index Exchange Inc. (formerly known as Casale Media).

108. ***Figure 8*** below is a screenshot from the Website, confirming that the Casale Media Tracker was triggered automatically upon visiting the homepage. A GET request to *cdn.indexww.com*, a domain operated by Index Exchange Inc. (formerly known as Casale Media), was recorded and returned a 200 OK status. The request delivered a tracking pixel designed to collect metadata for behavioral profiling and audience targeting. This request demonstrates the role of indexww.com within the broader Casale Media tracking infrastructure, which includes both casalemedia.com and indexww.com domains. This activity occurred prior to any user interaction, verifying that the Casale Media Tracker was active during the user's initial session on TRIPADVISOR's website.

/ /

/ /

/ /

CLASS ACTION COMPLAINT

1

**Figure 8**



109.    ***Figure 9*** below is a screenshot of network activity on the Website, capturing a DNS query and corresponding response for *js-sec.indexww.com*, a domain operated by Index Exchange Inc. (formerly known as Casale Media). This DNS transaction confirms that TRIPADVISOR's Website initiated a connection to Index Exchange's tracking infrastructure during the initial session load. The DNS request and response occurred before any user interaction and reflects background network communication consistent with third-party tracking operations. This request reflects part of the Casale Media Tracker's presence on the indexww.com domain, which operates alongside casalemedia.com as part of Index Exchange's tracking and identity infrastructure.

/ /

/ /

/ /

/ /

31

1

**Figure 9**



14      110.   Defendant surreptitiously installed, executed, or injected the Casale
15  Media Tracker onto users' browsers by embedding or referencing Index Exchange's
16  JavaScript tracking endpoint on the Website. When a user visits the Website, their
17  browser executes this code, initiating network requests that send metadata—including
18  IP address and page-level activity—to Index Exchange as part of a third-party
19  programmatic advertising workflow.

20      111.   The Casale Media Tracker is at least a "process" because it is software
21  that identifies consumers, gathers data, and correlates that data.

22      112.   The Casale Tracker is at least a "device" because in order for software to
23  work, it must be run on some kind of computing device.  See, e.g., James v. Walt Disney
24  Co. 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

25      113.   The Casale Media Tracker captures non-content signaling information—
26  such as IP addresses, URLs visited, timestamps, browser and device identifiers, and
27  referrer data—associated with electronic communications between the user and the
28  Website. This metadata constitutes addressing, routing, and signaling information that

CLASS ACTION COMPLAINT

allows Index Exchange to log and profile user behavior across digital properties.

114.    Through this process, Index Exchange engages in persistent user tracking, behavioral profiling, and audience segmentation—without the user's knowledge, consent, or meaningful ability to control the collection and dissemination of their personal browsing activity.

115.    Moreover, by enabling the Casale Media Tracker on the Website, Defendant allows Index Exchange to monitor users' activity beyond the Website itself. The Casale Media Tracker assigns or accesses persistent identifiers that allow Index Exchange to track the user across unrelated websites that also deploy its tracking infrastructure. This cross-site tracking enables the construction of longitudinal behavioral profiles based not only on users' interactions with the Website, but also on their broader web activity—entirely without the user's knowledge or authorization.

116.    The Casale Media Tracker initiates a connection to Index Exchange's servers (including ssum-sec.casalemedia.com and related endpoints under indexww.com) upon page load. This connection transmits signaling and routing metadata such as IP address, user-agent string, full URL, referrer header, and timestamp. These data points allow Index Exchange to identify both the source and destination of the communication and synchronize identifiers across ad platforms. Accordingly, the Casale Media Tracker functions as a pen register and/or trap and trace device and/or process.

117.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or Class Members' consent to install the Casale Media Tracker or to transmit data to Index Exchange.

118.    Defendant's secret installation of the Casale Media Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

/ /

CLASS ACTION COMPLAINT

# VI.    CLASS ALLEGATIONS

119.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

120.    **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more.  The exact identities of Class Members can be ascertained by the records maintained by Defendant.

121.    **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Plaintiff and Class Members are entitled to statutory penalties;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates the Cal. Civil Code § 1178.100, *et seq.;*
- Whether the Defendant's conduct violates CIPA; and

- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice.

122. **TYPICALITY:**   As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members.  Plaintiff's experience with the Trackers is typical to Class Members.

123. **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

124. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII.    <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

125.   Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

126.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

127.   Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

/ /

CLASS ACTION COMPLAINT

128.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.  CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>SECOND CAUSE OF ACTION</u>

### Violations of Cal. Civil Code § 1798.100, *et seq.*

### *By Plaintiff and the Class Members Against All Defendants*

### (Injunctive Relief Only)

129.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

130.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

131.    The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq*.

132.    The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

133.    The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

CLASS ACTION COMPLAINT

134.    Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

135.    Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

136.    Defendant has violated California Civil Code § 1798.100(b) by failing to provide notice "at or before" collection of personal information.

137.    Defendant has violated California Civil Code § 1798.120(a) by failing to provide consumers the ability to opt out before sharing their personal information including for cross-contextual behavioral advertising purposes.

138.    Defendant has violated California Civil Code § 1798.135(a)(1) by failing to provide a "Do Not Sell or Share My Personal Information" link on the homepage of the Website.

139.    By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice, Defendant violated CCPA.

140.    By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

141.    On May 29, 2025, Plaintiff provided Defendant with written notice pursuant to California Civil Code § 1798.150(b), identifying the specific provisions of the CCPA that Defendant violated. The letter was sent on behalf of Plaintiff and all others similarly situated.

142.    Plaintiff, on behalf of himself and the Class Members, presently seeks injunctive relief only under California Civil Code § 1798.150(a)(1)(B), and reserves the right to amend to seek statutory damages.

/ /

CLASS ACTION COMPLAINT

## IX.    <u>THIRD CAUSE OF ACTION</u>

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

143.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

144.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

145.    This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

146.    Defendant has engaged in unlawful business practices by:

(a) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy;

(b) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(c) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice.  Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc*., 101 F.4th 706 (9th Cir. 2025) (en banc).

147.    Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

148.    The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including

CLASS ACTION COMPLAINT

loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

149.    Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

150.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

151.    Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## X.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates CIPA, the CCPA, and Business & Professions Code § 17200;

CLASS ACTION COMPLAINT

3.    An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

4.    An order enjoining Defendant's conduct as alleged herein;

5.    Statutory penalties under CIPA;

6.    Prejudgment interest;

7.    Reasonable attorney's fees and costs; and

8.    All other relief that would be just and proper as a matter of law or equity.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated:    June 20, 2025        **NATHAN & ASSOCIATES, APC**

By:  /s/ Reuben D. Nathan
       Reuben D. Nathan , Esq.
       Attorneys for Plaintiff

CLASS ACTION COMPLAINT